Argued December 11, 1941; affirmed January 27, 1942

# STATE *v.* PORT OF PORTLAND
## (121 P. (2d) 478)

Before KELLY, Chief Justice, and BAILEY, BELT, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Rex Kimmell*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellant.

*Erskine Wood*, of Portland (Wood, Matthiessen & Rankin, of Portland, on the brief), for respondent.

BRAND, J.

■ The statute upon which the plaintiff relies for recovery was enacted in 1920 (General Laws of Oregon (S.S.) 1920, Ch. 32) since which time it has undergone many changes by amendment, both before and after the period in issue here. The statutes in effect in February, 1940 (the time of the taking of the sand), must control our decision. The relevant portions may be summarized as follows: The first section with which we are concerned authorized the State Land Board to lease the beds of navigable portions of navigable streams for the purpose of removing sand, etc., therefrom. Competitive bidding was required, and leases were to be on a basis of the price per cubic yard for material removed. 8 O. C. L. A. 121-601, L. 1920, Sp. Sess., ch. 32, sec. 1, P. 61, as amended by L. 1935, Sp. Sess., ch. 14, sec. 1, P. 28.

The next relevant section provides:

"Any person, firm or corporation, before taking gravel, rock or sand from state properties, shall apply to the state land board for a lease, and such application shall be accompanied by a map showing the premises and the ownership of the abutting property * * *".

That section then provides for notice, sealed bids and lease to the highest bidder and provides further that: "* * * the removal of material from the bed thereof for commercial uses, without having applied for and received a lease, hereby is declared to constitute a continuing trespass". 8 O. C. L. A. 121-603, L. 1920 Sp. Sess., ch. 32, § 2, p. 61; L. 1935, Sp. Sess., ch. 14, § 2, p. 28; L. 1937, ch. 27, § 1, p. 30.

The State Land Board "is authorized to proceed by action at law or suit in equity to enforce payment for all materials heretofore or hereafter taken from any

waters or stream, the bed of which belongs to the state of Oregon, for commercial uses, whether under lease, or otherwise, for which payment has not been made''. 8 O. C. L. A. 121-605, L. 1920, Sp. Sess., ch. 32, § 4, p. 61; L. 1927, ch. 268 § 1, p. 338; L. 1935, Sp. Sess., ch. 14, § 4, p. 29; L. 1937, ch. 27, § 2, p. 31.

The last section provides:

''It shall be unlawful for any person to remove gravel, rock or sand from the bed of any navigable stream of water, or from the bars of any navigable stream, or from any property of the state of Oregon, for commercial uses without complying with the provisions of this act; provided, that any person may take gravel, rock or sand exclusively for his own use. Any person violating or failing to comply with any of the conditions of this act shall be deemed guilty of a misdemeanor, * * * * ''. 8 O. C. L. A. 121-606, L. 1920, Sp. Sess., ch. 32, § 5, p. 61; L. 1935, Sp. Sess., ch. 14, § 5, p. 29.

We have noted the relationship of the foregoing provisions to the earlier statutes by reason of the problems of statutory construction which are here involved.

The defendant Port took sand from the bed of the Willamette river without applying for or receiving a lease. It is therefore liable for the stipulated royalty unless the sand was taken for non-commercial uses or unless it can be said that the sand was taken, in legal effect, by the Gas Company, exclusively for its own use. The plaintiff Land Board contends that the Port was not the agent of the Gas Company but was an independent contractor in removing the sand, and that therefore, in the eyes of the law, the sand was not taken by the Gas Company exclusively for its own use, but was taken by the Port. This question need not be determined unless the taking was for commercial uses. We shall first address ourselves to the latter question. Certain

.

provisions of the contract not heretofore noted are important. As tending to indicate that the sand was taken for commercial uses, the plaintiff contends that the transaction between the Port and the Gas Company involved a sale of the sand, and in support of its contention quotes the following provision of the contract, wherein payment for "material" is mentioned:

"The company will pay to the Port  *  *  *  all amounts becoming due the Port for dredge hire, pipe line maintenance, labor, material, and all other items furnished by the Port for the carrying out of the contemplated work  *  *  *  ".

The quotation ends too soon. The completed sentence ends as follows:

"The company will pay to the Port  *  *  *  all amounts becoming due the Port for dredge hire, pipe line maintenance, labor, material, and all other items furnished by the Port for the carrying out of the contemplated work *on the following basis, to-wit*:  *  *  *  ". (Italics ours.)

Then follows provision for payment of dredge hire at a stipulated amount per operating day, pipe line rental on a like basis "to offset wear and tear upon the pipe line used". There follows a detailed statement of the material to be paid for, as follows:

"The cost of all labor and material used in or for the shore work, including such labor and material as is used preliminary to the dredging in delivering and setting up pipe and trestles, spillways, preparing land, etc., removing shore pipe and other equipment upon cessation of the work as well as all labor and material used in handling shore operations during the progress of dredging. All labor and material shall be paid for at the actual cost to the Port and 2½ per cent shall be added to labor cost to cover employers and public liability insurance of the Port and which it assumes under paragraph 4 herein".

No mention is made of any price per yard or otherwise for sand. No maximum or minimum quantity of sand is stipulated. The depth of the proposed fill is not stated. The area of land marked for filling is not specified. The Gas Company reserves the right to order the work stopped at any time, and lastly it is provided:

"It is the further intent of this agreement, that, in any circumstances the Port shall be reimbursed, in accordance with the provisions of paragraph 6 hereof, for all costs and outlays made by it in preparation for or prosecution of the contemplated work regardless of the quantity of filling done or the practicable success of the filling".

We conclude that there was no sale of sand contemplated or made by the Port to the Gas Company. We assume that one may deal commercially in material for filling and diking, as, for example, where stock piles of gravel are maintained for which materials are sold, but it does not follow that the taking in a single instance of crude material by hydraulic dredge and spilling the same on lowlands is necessarily a taking for commercial uses. In fact, the contract with the Gas Company does not call for rock, sand or gravel, but only for such material as is available at the dredging locations, and the Port assumes no responsibility for the availability of suitable material, but agrees only to exercise skill and judgment in obtaining material deemed suitable. If it were not for the stipulation that the material taken was sand, an inference would arise from both common and judicial knowledge that the material of a fill pumped directly from the river bed onto lowlands would include large quantities of earth, silt and the like, not ordinarily a commercial product and not described in the statute as subject to lease. The 1941 act recognizing this defect enlarges the power

of the Land Board by adding to "gravel, rock, sand" the words "silt and other material". Even in view of the stipulation describing the material taken as sand, there is no evidence that it was such as ordinarily goes into the channels of trade by that name.

The attorney general, who prosecutes here in behalf of the Land Board, has previously in a different case construed the words "commercial uses" as used in this statute in the following language:

"It is quite evident that the words "commercial uses", as here used, mean the uses of the materials to be taken from such navigable waters, as commodities in trade and commerce". Opinions of Attorney-General, 1934-1936, p. 796 at 797.

The consideration paid to the Port gave rise to no private profit, nor so far as appears to any operating profit to the public corporation itself. The contract itself indicates that it was executed by reason of the desire to further the contemplated plant enlargement of the Gas Company "as tending to promote the commercial interests of the Port of Portland". To be sure, it does appear that the sand was deposited in the furtherance of a private, commercial and industrial enterprise by the Gas Company, and the plaintiff argues that:

"To contend that the company's enlarged plant, of which the material taken in this instance became a part, was not used commercially, would border upon the ridiculous ⚬ * *".

■ We agree, but the question is not whether a commercial enterprise will be prosecuted by the Gas Company on the real estate into which the sand was incorporated. On the contrary, the question is whether the sand, as such, was taken for commercial uses. We hold that it was not. The plaintiff contends that the amend-

ment of 1941 (subsequent to the period in issue here) expressly authorizes the removal without lease of sand for filling land, and that this amounts to a legislative construction of the section as it stood prior to the amendment and implies that there was no right to remove sand for filling land without obtaining a lease under the act as it stood in 1940. Upon first blush the inference may appear justified, but we have arrived at a different conclusion.

The provision of the 1941 act to which we have referred is as follows:

"Sec. 121-603. The removal of gravel, rock, sand, silt or other material from the bed or bars of any navigable stream within the state is authorized when the same is removed for channel or harbor improvement or flood control, and the removal of gravel, rock, sand, silt or other material from the bed or bars of any navigable stream within the state of Oregon is authorized when the material is used for filling, diking or reclaiming land located not more than one-half mile from the bank of the stream. No payment of royalty shall be required for such gravel, rock, sand, silt or other material unless the same shall hereafter be removed from the place deposited and sold or used *as an article of commerce.* Before any such material may be removed from the place deposited and sold or used *as an article of commerce,* the state land board shall be duly notified in writing of such intended removal and sale or *use as an article of commerce* and payment shall be made to said state land board of such royalty as the board may fix therefor. In addition to the purposes above enumerated, any person may take gravel, rock, sand, silt or other material for his own exclusive use to the extent of not more than 50 cubic yards in any one year. Any person, firm or corporation, before taking gravel, rock or sand from state properties, except in the manner and for the purposes aforementioned in this section, shall apply to the state land board for a lease   *   *   *   *.

The establishment or placing of a dredging or digging outfit on any waters or stream, the bed of which belongs to the state of Oregon, and the removal of material from the bed thereof *for commercial uses,* without having applied for and received a lease, hereby is declared to constitute a continuing trespass." L. 1941, ch. 420, p. 713. (Italics ours.)

Thus it appears that the removal of sand and other materials is authorized for filling lands without the payment of royalties, "unless the same shall hereafter be removed from the place deposited and sold or used as an article of commerce".

It appears further that sand destined for a fill may or may not be used as an article of commerce, and from this statute a strong inference arises that material transferred directly from the bed of a stream to adjacent lands for the purpose of filling is not considered "used as an article of commerce". The provision which limits the authorization to filling, diking or reclaiming land located not more than one-half mile from the bank of the stream suggests that there is a distinction between filling operations adjacent to the stream which may be accomplished by direct transfer by hydraulic dredge and the like, on the one hand, and filling operations at a greater distance which would involve the transportation of material by truck or otherwise, more closely resembling the handling of ordinary articles of commerce, on the other.

It is significant that after authorizing the taking of filling material without a lease unless it is thereafter removed and sold as an article of commerce, the 1941 act reverts to the language employed in every previous act, and the penal section, 8 O. C. L. A. 121-606, as amended in 1941, merely provides that "It shall be unlawful to * * * remove * * * sand * * *

*for commercial uses* without complying with the provisions of this act''. (Italics ours). Obviously, it was considered that the use of the old and familiar phrase ''for commercial uses'' did not forbid what had just been authorized. If the clause prohibiting the taking ''for commercial uses'' without a lease had been thought to place a prohibition on the authorized taking of material for adjacent filling, then the legislature in 1941 would have employed different phraseology in the penal section, so as to make clear that acts were not prohibited in the penal section which had been authorized in the preceding one.

■■ The reasonable inference is that the 1941 amendment was intended to clarify the statute as it stood prior to 1941 by setting forth specifically what was meant by commercial uses and what was excluded from that term. The 1941 amendment therefore does not militate against our conclusion that the direct taking and depositing of sand on the property of the Gas Company under O. C. L. A. 121-603 was not for commercial uses, as that phrase is used in the statute both before and after the 1941 amendment.

■ One other contention of the plaintiff requires notice. Section 5 of the original act of 1920 provided:

''It shall be unlawful * * * to remove * * * sand * * * except for the purpose of filling or diking lands or from any property of the state of Oregon for commercial uses except with the consent of the state land board * * *''.

The amendment of 1935, now O. C. L. A., 121-606 (quoted supra), eliminates the phrase ''except for the purpose of filling and diking lands''. It is urged that such elimination implies that filling or diking lands is a commercial use, but we think it rather indicates that

such operations may constitute either a commercial or non-commercial use and that the elimination from the 1920 act of the clause concerning the filling and diking was intended to leave in effect a single test, namely, whether or not the particular operation of filling or diking constituted a commercial use, under all the circumstances of the individual case. We are of the opinion that the elimination of the clause concerning filling and diking lands from section 5 of the Laws of 1920 is not to be taken as requiring a lease under the amended act, unless the particular facts of filling or diking indicate that it is a commercial transaction.

Some of the circumstances which we have considered may tend to indicate that, in the eyes of the law, the Gas Company should be deemed to be the taker exclusively for its own use, whether by agent or by independent contractor, although the physical acts were done by the Port, but we rest the decision on the proposition that the taking in this instance was not for commercial uses.

It appears from the stipulation of the parties that upon the date of the execution of the contract certain persons were members of the Board of Commissioners of the Port of Portland and were at the same time directors of the Portland Gas and Coke Company, having, however, only a nominal financial interest in the latter company. In the view which we have taken of the case, it becomes unnecessary to determine the propriety of their conduct in authorizing the contract or the validity thereof. We express no opinion on that phase of the case.

Judgment of the circuit court of Multnomah county is affirmed.